

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-14-00362-CV

**IN RE GUARDIANSHIP OF** Terry L. **GILMER**, Proposed Ward

From the County Court at Law, Kendall County, Texas
Trial Court No. 13-070-PR
Honorable Bill R. Palmer, Judge Presiding

Opinion by:    Patricia O. Alvarez, Justice

Sitting:    Patricia O. Alvarez, Justice
            Luz Elena D. Chapa, Justice
            Jason Pulliam, Justice

Delivered and Filed:  June 10, 2015

REVERSED AND REMANDED

Daniel Gilmer and Sharlene Gilmer Anderson filed an application for the appointment of a guardian of the person and estate of their mother, Terry L. Gilmer. The trial court appointed an attorney ad litem to represent Terry in the proceeding, and the attorney ad litem filed a motion in limine challenging Daniel and Sharlene's standing on the basis that they have an interest adverse to Terry. The trial court granted the motion and dismissed Daniel and Sharlene's application. On appeal, Daniel and Sharlene contend the trial court erred by: (1) taking judicial notice of the court's records in another court proceeding; and (2) concluding they lack standing because they have an interest adverse to Terry. We reverse the trial court's order and remand the cause for further proceedings.

## PROCEDURAL BACKGROUND

### A.    Application for the Appointment of a Guardian

Daniel and Sharlene filed a verified application for the appointment of a guardian for the person and estate of Terry in May of 2013.  At that time, Terry was 63 years old, and she and her husband of forty-three years, Michael, were involved in divorce proceedings.

The verified application alleged Terry did not have the capacity to make proper decisions concerning her living arrangements and her medical treatment.  The application referred to specific occurrences since June of 2012 to support the allegations, including the following:

1.    Terry has hoarding tendencies and lacks the ability to provide for her own hygienic care.  For example, she filled the bathroom of her home with used adult diapers.

2.    On July 9, 2012, Terry moved to an assisted living center and was classified as a level 2 resident on a scale of 1-3, with 3 being the highest level of care.  On July 21, 2012, Daniel received a phone call from the assisted living center reporting that Terry was inconsolable but would not commit suicide due to her religious beliefs.

3.    On August 15, 2012, Terry voluntarily checked herself into University Hospital for a psychological evaluation but was determined not to exhibit an imminent threat to herself or others.  The assisted living facility allowed Terry to return subject to her undergoing a psychiatric evaluation at Laurel Ridge, a psychiatric hospital, the following week.

4.    On August 17, 2012, Laurel Ridge evaluated Terry and did not find she exhibited an imminent threat to herself and others, but the assisted living facility only allowed Terry to return based on her agreement to attend continuing outpatient treatment at Laurel Ridge.

5.    On August 23, 2012, Terry disappeared after her outpatient treatment session.  The family located Terry using credit card information and found her at a hotel which reported Terry had a large diarrhea accident in the breakfast area, and the person who accompanied her to the hotel had left.  Terry was incoherent when Daniel spoke with her on the phone, and Daniel asked the hotel employee to call EMS.  Terry was transported to Baptist Hospital, and her primary care physician sent paperwork to have Terry admitted to Laurel Ridge. The assisted living facility would not allow Terry to return without proper psychological and medical treatment.

6. On August 26, 2012, a friend went to visit Terry at Baptist Hospital and found her walking around naked in her room crying. On August 27, 2012, Sharlene received a phone call that Terry was refusing all services, and Sharlene requested they coordinate with Terry's primary care physician and Laurel Ridge. On August 31, 2012, Terry was moved to the behavioral health unit of another hospital after which she began communicating with family and friends. Terry told Sharlene she needed help.

7. On September 4, 2012, Terry asked Daniel for blank checks when he visited her at the hospital and was angry when he refused to provide them to her. Terry's purse had been lost, and she did not have her identification card or credit card.

8. On September 6, 2012, Terry's sister, Linda, arrived at the hospital and took over Terry's care. On September 7, 2012, Terry left the hospital with Linda, and the hospital called the police because Terry still had a peripherally inserted central catheter (PICC) line in her body. That same day, Sharlene received a phone call that an employee of Adult Protective Services went to the hospital to investigate a claim of abuse Terry made against Sharlene, but Terry had left the hospital. Terry's brother, Steven Meagher, reported that he spoke with Linda who informed him Linda and Terry were removing the SIM card from their cell phone so they could not be tracked, and they would have the PICC line removed at a clinic.

9. On September 12, 2012, Michael filed a missing persons report. The police located Terry and reported she was in good health. The family subsequently discovered Terry was with Linda in Arizona. On September 28, 2012, Terry removed all of the funds from one of her and Michael's joint bank accounts.

10. On October 2, 2012, Michael filed for divorce. On October 10, 2012, Terry was served with citation. On October 15, 2012, Terry filed a police report claiming Michael, Daniel, Sharlene and the assisted living center poisoned her.

11. On December 11, 2012, Terry refused to enter the courtroom during a hearing on interim spousal support. When Daniel tried to hug Terry, Terry accused him of trying to murder her.

12. On January 8, 2013, Michael was informed that Terry had filed insurance claims with their insurance company relating to a stolen Dodge Caravan and a burglary of their home where Michael was still living. Terry also filed a police report regarding the burglary. Michael informed the insurance company and the sheriff that Terry's report was false. Terry also changed the contact information at the bank where Terry and Michael had their checking and savings accounts to Linda's phone number, email, and address.

13. On April 17, 2013, Terry filed a lis pendens against Daniel's home, claiming it was purchased with community property funds. Terry's attorney in the

divorce proceeding sent a letter to Michael's attorney stating Terry was very ill from renal cysts, which were to be tested for malignancy, and collapsed vertebrae in her neck. The letter stated Terry was taking pain medication and would not be able to attend a scheduled deposition. Terry's attorney included a letter from Terry's doctor stating he was in the process of scheduling Terry for cervical spinal fusion surgery.

In addition to alleging Terry did not have the capacity to make proper decisions regarding her medical treatment and living arrangements, the application also alleged Terry was unable to handle her own financial affairs. The application stated Terry was a beneficiary of a trust created by her mother-in-law called the Nana Seeley Gilmer Trust ("Trust"), and the value of the property Terry was entitled to receive from the Trust had an approximate value of $1,000,000.[1] The application further stated Terry had filed a 2012 income tax return stating she was single and earned $57,000 in income.

In the application, neither Daniel nor Sharlene requested to be appointed as guardian. Instead, they requested the appointment of a qualified and suitable individual or institution as guardian. After the application was filed, the trial court immediately appointed an attorney ad litem, who filed an answer generally denying the allegations.

**B.      Motion to Undergo an Independent Mental Examination**

In July of 2013, Daniel and Sharlene filed a motion for Terry to undergo an independent mental examination. The trial court held a hearing and verbally granted the motion on October 21, 2013;[2] however, the trial court did not sign the written order until February 6, 2014. The written order required a "supplemental" forensic medical examination to be completed by March 6, 2014. The use of the term "supplemental" is an apparent reference to a prior examination Terry

---

[1] The Trust terminated when Terry's mother-in-law passed away on July 21, 2012; however, no distributions from the Trust have been made.

[2] No reporter's record from this hearing is included in the appellate record.

underwent in connection with the divorce proceeding.[3]  The report produced as a result of that examination stated the doctor had not reviewed "any substantive collection of medical records" but relied on Terry's self-reporting.  Even with those limitations, the report concluded Terry will "need the assistance of a neutral party to help manage her estate in her best interests."

On February 27, 2014, Terry's attorney ad litem filed a motion in limine challenging Daniel and Sharlene's standing.  The motion quotes excerpts from emails and a recorded telephone conversation and asserts Sharlene is antagonistic toward Terry and both Daniel and Sharlene seek to preserve the Trust's funds for their own benefit.  The motion asserts Daniel and Sharlene have a financial interest in Terry's assets that is adverse to Terry.

## C.      Evidentiary Hearing before the Trial Court

The trial court held an evidentiary hearing on the motion in limine on April 1, 2014.  Daniel, Sharlene, and Terry's brother Steven testified at the hearing.  In addition, several emails and the recorded phone conversation referenced in the motion in limine were introduced into evidence.  As will be explained later in this opinion, this court must conduct a de novo review of the trial court's ruling.  For this reason, the evidence presented at the hearing is set forth in great detail.

### 1.      Exchanges between the Parties

#### a)      January 8, 2013 Daniel Email to Steven

In January of 2013, Daniel sent Steven an email informing him about the changes Linda and her mother had made to the joint bank accounts owned by his parents.  Daniel attached to the email the notice his father had received from the bank about the changes including the change to Linda's email address.  Daniel also informed Steven about the reported burglary, and that he had received a phone call from the police because his mother reported he had stolen things from his

---

[3] The trial judge presiding over the guardianship proceeding is the same trial judge who ordered the examination in the divorce proceeding and to whom the doctor addressed his report.

parent's house. Daniel attached the claim overview the insurance company sent his father. Daniel stated he was to the point of considering legal action against his mother and Linda because "there is only so much that I can be understanding before I need to protect myself and people I love." Daniel believed his father had held his mother in check for years but also believed his mother would continue down a path of hate since she left his father.

### b) March 14, 2013 Telephone Conversation between Daniel and Steven

In a recorded telephone conversation from March 14, 2013, Daniel told Steven even if his parents get divorced, Linda needs to go home because she was destroying their family. Daniel told Steven that his father was horrified by what was happening. Daniel also was horrified that his mother was willing to trade her children and grandchildren for Linda, who his mother had called crazy her entire life. Daniel wondered what influence Linda had over his mother. Daniel stated his mother needed help, and he had moved from Utah to Texas to help her. Daniel informed Steven his mother had an addiction to pain medication a few years earlier and stressed she needed to see doctors and get situated with her medication. Daniel was calling Steven to let him know what to expect because they would be fighting back really soon. They were trying to carry his dad through the situation. In an effort to figure "this thing out," Daniel informed Steven that his dad was taking the lead on the divorce, and Daniel and Sharlene were taking the lead on the "'undue influence' against Linda." Daniel stressed the Trust funds should not be going to the Meagher family. When Steven interjected a question as to whether the assets would be going to Terry, Daniel asserted everything that goes to his mother will go to Linda because Linda had "full medical and power of attorney" authority and was signing all of his mother's checks. Daniel stated Linda needed to go home so he could have direct communication with his mother so they "can start figuring this out. We cannot figure this out because we are being blocked left and right because of Linda." Daniel told Steven about his mother accusing his father of poisoning her with radiation. Daniel was

"scared" for his mother and could not sit back any longer. Daniel stressed his plan was to proceed with an undue influence claim against Linda which had nothing to do with his parent's divorce. In response to Steven's question about what would happen to Terry if Linda left, Daniel stated he had doctors lined up for his mother, including nutritionists and physical therapists. Daniel expressed concern that Linda would receive all of his paternal grandmother's "stuff" including any family heirlooms his mother would receive. Daniel expressed his desire to meet with his mother and find out if she actually believed her accusations. Daniel stressed they needed to "move against Linda, to basically help my Mother. And if my Mother doesn't want that, that's what we need to know."

### c) March 14, 2013 Daniel Email to Terry's Attorney

On the same day as this phone conversation, Daniel sent an email to Terry's attorney in the divorce proceeding, stating he did not believe his mother was in control of her actions but was being influenced by Linda. Daniel stated he was unable to have direct contact with his mother and was sad and fearful of the situation because he was unable to talk to his mother without Linda monitoring the communication. Daniel asked the attorney to tell his mother that he was concerned about her well-being and was always willing to help her in any way he could. The attorney responded that she would give Daniel's message to Terry.

### d) March 26, 2013 Daniel Email to Terry's Attorney

Daniel sent a second email to Terry's attorney on March 26, 2013, noting talks between his parents had "broken down." Daniel asked the attorney to tell his mother that he wanted to talk to her because her family and friends were "all worried about her situation and [their] lack of knowledge of what [was] going on in her life." Daniel expressed concern that Linda was controlling his mother and wanted his mother to know he would support her. Daniel stated, "I am,

and will always be her only son and it pains me what has happened and is still happening with my Mother."

   e)  March 27, 2013 Daniel Email to Terry's Attorney

  On March 27, 2013, Daniel sent a third email to Terry's attorney, thanking her for her efforts and sharing the content of a text message he received from his mother. The message stated for Daniel and Sharlene to stop the untrue emails to her attorney. The message stated Daniel and Sharlene were no longer part of her life, asserting, "How many ways will it take for you to realize you have been disinherited and have no power over me any more [sic]." In his email to the attorney, Daniel made a formal request for a meeting with his mother, offering to bring a sheriff, her brother, and any of her hundred family friends with him; however, Daniel emphasized Linda was not invited to the meeting. Daniel expressed four reasons for the meeting: (1) to know his mother is the one disinheriting her children and grandchildren; (2) to understand what he had done to deserve "this" after moving his family to Texas to help her; (3) to ask her the reasons she is doing these and other actions against our family and friends; and (4) to tell him in person that she wants him to stop being her only son.

   f)  March 27, 2013 Daniel Email to Steven

  Daniel also sent a follow-up email to Steven sharing the content of the text message from his mother. Daniel stated Linda is an evil person and needed to leave his family alone. Daniel stated he loved his mother and the situation was getting out of control. Daniel offered to buy Steven a plane ticket to Texas to come and help "fix this." Daniel refused to believe his mother had sent the text message, stating, "she would never be this low to me and my family."

   g)  March 27, 2013 Sharlene Email to Steven

  Sharlene also sent an email directed to Steven in response to her mother's text message, stating she no longer desired to have her mother back in her life and describing Linda and her

mother as "the most evil, greedy, manipulative people I've ever dealt with." Sharlene expressed that Linda and her mother were creating a world of lies and deceit and "are laying in the filth they created and chose for themselves." Sharlene expressed anger that Daniel was getting rebukes and threats for his effort to reach out to their mother. Sharlene stated Linda was using Terry for her money, and Terry was using Linda for "validation of her own selfish desires."

### h) March 30, 2013 Terry's Attorney Email to Daniel

On March 30, 2013, Terry's attorney emailed Daniel informing him she forwarded his email requesting a meeting to Terry, and Terry asked the attorney to respond. The attorney stated Terry was safe and was addressing her medical needs. Although Terry loved Daniel and Sharlene, she did not want any further contact until the divorce was finalized. Terry was upset that they were writing her off as mentally ill and willing to institutionalize her instead of recognizing she had medical issues. Terry voluntarily left the hospital with Linda because she was informed she would be "going to a lock down unit in a nursing facility, upon her release." Terry believed the motivation was money.

### i) Daniel Response to Terry's Attorney's Email of March 30, 2013

Daniel responded to the attorney's email stating the problem was a lack of communication. Daniel wanted the opportunity to talk to his mother, to answer her questions, and to obtain her answers to his questions. With regard to the money, Daniel stated he loved his paternal grandmother, and her estate was created for her children, grandchildren, and great grandchildren. Daniel stressed, "Its [sic] not about money its [sic] about family priorities." Daniel stated he moved his family to Texas "to help figure this out with my mother," and that is why he wanted to talk to her.

## 2. *Steven Testimony*

In addition to identifying several of the foregoing exhibits at the hearing, Steven testified he first started to hear about the guardianship matter in 2012, when he spoke with Terry by telephone and she told him a guardianship was being pursued. When questioned about his reason for recording the telephone conversation with Daniel, Steven stated he felt the need to protect his family from bodily harm given the reports of his sisters being poisoned. Although he had not been threatened, his sisters were planning to visit him, and Steven was concerned his family would be in danger because his sisters had been poisoned. Steven was willing to serve as Terry's guardian if the trial court decided to appoint a guardian and had contacted a lawyer to learn his responsibilities in that regard. Based on the emails he received, Steven testified he believed Daniel and Sharlene were making a claim against Terry's assets.

## 3. *Daniel Testimony*

Daniel testified the guardianship application was filed because they were concerned for their mother's safety. Daniel testified the concern began when Terry left Michael in June of 2012. Based on this concern, Daniel moved his family from Utah, where he had lived for approximately fifteen years, to Texas. Daniel testified about the numerous police reports his mother had filed, and about the lis pendens filed against his home even though he paid for his own house. Daniel was in fear for his mother because her reality was based on what Linda was telling her. Daniel did not have any claims against his mother's property and testified he was not a beneficiary of the Trust. Daniel was unaware Steven had recorded their phone call and had reached out to him in an attempt to obtain help from his mother's side of the family, the Meaghers. Daniel's communication with Steven was "one directional" because Steven kept stating he was too far away to help and was not financially able to help if Linda and Terry wanted to move to Washington. Daniel applied for the guardianship because he was in fear for his mother and wanted to make sure

she was in a good medical situation. A voicemail Daniel received from his mother in August of 2012 pleading for his help was played for the trial court. Daniel testified he received the voicemail a few days before an incident at a hotel where his mother was found dehydrated with diarrhea.

Daniel did not want to be appointed as guardian but wanted a competent third party to be appointed as guardian to handle his mother's finances. Daniel stated he was not a doctor and wanted competent people to watch over his mother. With regard to the statements he made in the emails about the Trust, Daniel explained he believed his paternal grandmother wanted her money to go to the Gilmer side of the family, which included his mother, not his mother's side of the family, the Meaghers. Daniel explained the Meaghers disliked the Gilmers because of their religion, and he did not know any of the Meaghers. When his maternal grandmother died, food providers discovered her dead in her home in Arizona, and Daniel testified his mother was currently staying in a tent outside that home.

4.    *Sharlene Testimony*

Sharlene testified she wrote the email calling her mother evil when she was really angry at all of the accusations her mother had made against her father and brother. Sharlene testified her mother needed a guardian for her estate because Linda was taking over and making decisions that were not in her mother's best interest, including incurring debt in her mother's name. Sharlene was concerned Linda would have access to the Trust assets her mother received because their bank accounts were commingled. Sharlene described her mother's history with drug abuse and addiction and stated her mother has had "deep medical issues for at least 20 years." Sharlene stated her mother was a hoarder and would fill the bathrooms in their home with hundreds and hundreds of water bottles. When Sharlene last visited her mother in June of 2012, before her mother left her father, her mother had filled bathrooms full of her used adult diapers.

Like her brother, Sharlene also did not want to be appointed as guardian but wanted a bank to be appointed to manage her mother's assets. In response to whether she favored her father over her mother in the divorce action, Sharlene stated she was not involved in the divorce action. Sharlene stated she did not have any beneficial interest in any of her mother's property or in any of her mother's Trust distributions. Sharlene wanted her mother to be in a safe place where she could get healthy. Sharlene was grateful her mother would receive the Trust money because her mother's medical care would be expensive, and the Trust would give her the resources to pay for it. Sharlene wanted a team of medical professionals to decide the best place for her mother to live, noting the assisted living facility had been unable to care for her.

At the conclusion of the hearing, the trial court announced its finding that Daniel and Sharlene had an interest adverse to Terry and dismissed their application. Daniel and Sharlene timely appealed.

### JUDICIAL NOTICE

Daniel and Sharlene assert the trial court erred in taking judicial notice of the records from the divorce proceeding pending between their parents. Specifically, Daniel and Sharlene contend the trial court could not take judicial notice of the records without giving them prior notice of its intent, and they did not discover the trial court took judicial notice of the records until they received the trial court's findings of fact and conclusions of law which were signed approximately one and a half months after the hearing on the motion in limine.[4]

A trial court may take judicial notice sua sponte; however, if the court takes judicial notice before notifying a party, the party, on request, is still entitled to be heard. TEX. R. EVID. 201(c)(1), (e); *In re C.L.*, 304 S.W.3d 512, 515 (Tex. App.—Waco 2009, no pet.). In this case, Daniel and

---

[4] The trial court held the hearing on April 1, 2014, and signed the order granting the motion on April 29, 2014. The trial court signed the findings of fact and conclusions of law on June 18, 2014.

Sharlene were not notified before the trial court took judicial notice and filed an objection to the use of judicial notice approximately one week after the trial court signed the findings of fact and conclusions of law.

In its findings of fact and conclusions of law, the trial court took judicial notice that Daniel filed a motion in the pending divorce proceeding to expunge a lis pendens Terry filed. Even if we assume the trial court erred in taking judicial notice of this filing, Daniel and Sharlene have not shown how they were harmed by the trial court's action. *See* TEX. R. APP. P. 44.1. Both Daniel and Sharlene testified Terry filed the lis pendens which was expunged after Daniel filed his motion. Accordingly, the trial court's judicial notice was cumulative of evidence that was properly admitted, making any error in the taking of judicial notice harmless. *See Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004) ("Clearly, erroneous admission is harmless if it is merely cumulative.").

### STANDARD FOR DETERMINING STANDING
### V. STANDARD TO QUALIFY FOR APPOINTMENT

In its conclusions of law, the trial court refers to section 1104.354 of the Texas Estates Code, which contains the standard for determining whether a person is qualified to be appointed as a guardian. For example, under section 1104.354(1) of the Estates Code, a person may not be appointed guardian if the person's parent is a party to a lawsuit concerning or affecting the welfare of the proposed ward unless the trial court makes requisite additional findings. TEX. ESTATES CODE ANN. § 1104.354(1) (West 2014). In this case, the trial court cited section 1104.354(1) as support for its conclusion that Daniel and Sharlene did not have standing because their father, Michael, was a party to a pending divorce proceeding that concerned or affected Terry's welfare.

**A.      Standard of Review**

A trial court's conclusions of law present a legal question that we review de novo.  *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).  An erroneous conclusion of law does not require reversal if the trial court rendered the proper judgment.  *Id*.

**B.      Analysis**

The standard for determining a person's standing to file a guardianship application under section 1055.001(b)(1) is distinct from the standard for determining whether a person is disqualified from being appointed as guardian under section 1104.354.  *Compare* TEX. ESTATES CODE ANN. § 1055.001(b)(1) (West 2014)[5] *with* TEX. ESTATES CODE ANN. § 1104.354 (West 2014)[6].  The standards are different because standing under section 1055.001(b)(1) is a threshold requirement that must be met to simply proceed with an application which is unlike the merits-based determination of which person should be appointed as guardian.  A good example of these differences arises in regard to the issue of debt.  A person who is indebted to the proposed ward is disqualified from serving as guardian unless the debt is paid before the appointment; however, being indebted to the proposed ward does not automatically deprive a person of standing to apply for a guardianship.  *In re Guardianship of Miller*, 299 S.W.3d 179, 188–89 (Tex. App.—Dallas 2009, no pet.); *Betts v. Brown*, No. 14-99-00619-CV, 2001 WL 40337, at \*4 n.2 (Tex. App.—Houston [14th Dist.] Jan. 18, 2001, no pet.) (not designated for publication).  Although there may be instances in which evidence supporting disqualification under section 1104.354 also would support a finding of an adverse interest under section 1055.001(b)(1), we disagree that a person

---

[5] Section 1055.001(b)(1) states: "A person who has an interest that is adverse to a proposed ward or incapacitated person may not file an application to create a guardianship for the proposed ward or incapacitated person." *Id*.
[6] Section 1104.354 prevents a person from being appointed guardian if the person: (1) "is a party or is a person whose parent is a party to a lawsuit concerning or affecting the welfare of the proposed ward, unless the court" makes two specific, requisite findings; (2) "is indebted to the proposed ward, unless the person pays the debt before appointment;" or (3) "asserts a claim adverse to the proposed ward or the proposed ward's property." *Id*.

whose parents are parties to a divorce proceeding will always lack standing under section 1055.001(b)(1) to apply for a guardianship to be created for one of his or her parents. Therefore, to the extent the trial court's conclusion that Daniel and Sharlene lack standing is based on the pendency of the divorce proceeding between their parents, we hold the trial court's conclusion is erroneous. As previously noted, however, the trial court's erroneous conclusion will not require reversal if the trial court's conclusion that Daniel and Sharlene lack standing is supported on a proper basis.

## STANDING

The trial court's order states Daniel and Sharlene lack standing under section 1055.001(b)(1) of the Texas Estates Code because they have an interest that is adverse to Terry. Daniel and Sharlene assert the evidence is insufficient to support the trial court's findings. Even if the evidence is sufficient to support the findings, Daniel and Sharlene further assert the findings do not support the trial court's conclusion that they have an adverse interest under section 1055.001(b)(1).

### A. Standard of Review

"A person who has an interest adverse to a proposed ward or incapacitated person may not file an application to create a guardianship for the proposed ward or incapacitated person." TEX. ESTATES CODE ANN. § 1055.001(b)(1) (West 2014). The trial court must "determine by motion in limine the standing of a person who has an interest that is adverse to a proposed ward or incapacitated person." *Id*. at § 1055.001(c). Whether a person has standing to file an application to create a guardianship is a question of law which we review de novo. *In re Guardianship of Benavides*, No. 04-13-00197-CV, 2014 WL 667525, at *1 (Tex. App.—San Antonio Feb. 19, 2014, pet. denied) (mem. op.); *In re Guardianship of Miller*, 299 S.W.3d at 188.

**B.** **Definition of Adverse Interest**

As previously noted, a person lacks standing to file an application to create a guardianship if the person has an interest that is adverse to the proposed ward. TEX. ESTATES CODE ANN. § 1055.001(b). The Estates Code does not define what constitutes an interest adverse to the proposed ward. *In re Guardianship of Miller*, 299 S.W.3d at 189. Therefore, we must look to appellate court decisions addressing standing challenges to formulate an understanding of how the term has been applied in different contexts.

In *Allison v. Walvoord*, 819 S.W.2d 624, 625 (Tex. App.—El Paso 1991, orig. proceeding [leave denied]), the wife of a proposed ward filed an application for the appointment of a limited guardian for her husband. The plaintiffs in two pending lawsuits against the proposed ward sought to contest the application, but the wife challenged the plaintiffs' standing. *Id*. The trial court found the plaintiffs had standing, and the wife filed a mandamus petition seeking to have the trial court's order vacated. *Id*.

The El Paso court held the plaintiffs were not interested in the welfare of the proposed ward. *Id*. at 626. The court noted the plaintiffs' interest was in obtaining a substantial judgment against the proposed ward "which could only adversely affect his welfare." *Id*. Because the plaintiffs were not interested in protecting the proposed ward's well-being, the El Paso court held the plaintiffs lacked standing. *Id*. at 627.

In *Betts v. Brown*, the Houston court generally defined an adverse interest as an interest that does not promote the well-being of the ward or an interest that adversely affects the proposed ward's welfare. 2001 WL 40337, at *4. After stating this broad definition, the Houston court then examined the trial court's finding that an applicant, Bonnie Jackson Brown, lacked standing to file an application for a guardianship because she had an adverse interest to the proposed ward based on the manner in which she had handled the proposed ward's bank account. *Id*. Specifically, the

court noted Brown was unable to account for checks written to Cash by fully explaining the expenditures or producing receipts. *Id.* The court also noted Brown paid her own legal fees from the proposed ward's bank account. *Id.* Noting that the trial court's findings might disqualify Brown from being appointed as guardian, the Houston court asserted it could not conclude Brown's interest "so adversely affected the well-being of the ward as to deny her standing." *Id.* Distinguishing *Allison*, the court noted,

> Unlike the contestants to the guardianship proceeding in *Allison*, whose sole interest in contesting the guardianship was against the well-being of the proposed ward, it cannot be said that Brown was not concerned with Jackson's well-being. The record reflects that prior to the initiation of these guardianship proceedings, Brown in fact did care for Jackson. Jackson stayed with Brown, Brown took Jackson to her doctor's appointments, and Brown actively sought out residential facilities that could care for Jackson. Brown's interest did not rise to such a level as to be against the well-being of Jackson.

*Id.* Based on the foregoing, the Houston court held the trial court erred in finding that Brown lacked standing. *Id.*

## C.      Analysis

In this case, the trial court based its conclusion that Daniel and Sharlene have an adverse interest on findings that they supported their father in the divorce proceedings and wanted to "make sure Terry Gilmer's trust money remains with the Gilmer family." Although there is some evidence to support these findings, we must determine whether these findings establish that Daniel and Sharlene had an interest that rose "to such a level as to be against [Terry's] well-being." *Id.*

Although Daniel stated they were helping their father deal with the emotional trauma of the divorce, the evidence also showed the actions Daniel had taken in his effort to support his mother, including moving his family from Utah to Texas to help his mother. Daniel was concerned that his mother's reality was off, using Terry's reporting that Michael was poisoning her with uranium as an example. After describing his mother's voicemail pleading for his help, Daniel

testified that he feared for his mother's health and safety. Daniel stated he wanted competent people to watch over his mother's health. Similarly, Sharlene testified she wanted her mother safe and to understand her family loves her and is not trying to kill her. Sharlene explained they had received reports that their mother had been falling and had renal failure. Sharlene testified she wanted a team of competent medical professionals to determine a safe place for Terry to live.

With regard to the Trust, Sharlene testified about her concern that Linda was manipulating her mother. For example, Sharlene stated her mother's name had been added to one of Linda's credit cards with $30,000 in debt. Sharlene explained Linda was on all of her mother's bank accounts, and any money her mother received would be deposited into these commingled accounts. Although Daniel and Sharlene expressed concerns about the manner in which their mother might spend the Trust money, neither Daniel nor Sharlene were trustees of the Trust or controlled the Trust's assets. In addition, neither Daniel nor Sharlene sought to be appointed as the guardian, but wanted an independent third party appointed as guardian who would be able to develop the best plan to manage their mother's assets. Finally, as previously noted, Daniel and Sharlene were aware of a doctor's report opining that their mother needed the assistance of a neutral party to help manage her estate.

After reviewing the entire record and considering the issue of standing under our de novo standard of review, we hold the trial court's findings do not support its conclusion that Daniel and Sharlene lack standing. Although the evidence showed that Daniel and Sharlene expressed an interest in their father's emotional well-being and in their mother's ability to manage the assets she would receive from the Trust, the evidence did not show that those interests were sufficient to establish a lack of standing by rising "to such a level as to be against [Terry's] well-being." *Id*.; *see also In re Guardianship of Parker*, 275 S.W.3d 623, 632 (Tex. App.—Amarillo 2008, no pet.) (holding evidence that guardianship applicant's son believed his mother was concerned about

future inheritance from her mother's (the proposed ward's) trust was insufficient to support a finding of adverse interest).

The only other finding the trial court made to support its conclusion was that Daniel filed a motion in the divorce proceeding to expunge the lis pendens Terry filed against his home. This court has held that a person who is suing a proposed ward or incapacitated person has an interest adverse to the proposed ward or incapacitated person. *In re Guardianship of Benavides*, 2014 WL 667525, at \*1; *In re Guardianship of Valdez*, No. 04–07–00712–CV, 2008 WL 2332006, at \*2 (Tex. App.—San Antonio June 4, 2008, pet. denied) (mem. op.). In this case, however, the evidence established that the motion to expunge was granted, and Daniel no longer has any pending claim against Terry. Therefore, unlike the cited cases, Daniel is not "suing" Terry because he is not currently involved in litigation against her.

## CONCLUSION

The trial court erred in concluding Daniel and Sharlene lacked standing to file an application seeking the appointment of a third person as the guardian of the estate and person of their mother. Therefore, we reverse the trial court's order granting the motion in limine and dismissing the application for the creation of a guardianship.

Patricia O. Alvarez, Justice